# Richmond

MRS. F. H. SUTHERLAND, ET ALS. V. RECEIVER FOR DICKENSON COUNTY BANK.

January 17, 1935.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Chinn, JJ.

The opinion states the case.

*S. H. & George C. Sutherland,* for the plaintiffs in error.

*G. Mark French* and *W. B. Phipps,* for the defendant in error.

CHINN, J., delivered the opinion of the court.

Cumberland Bank and Trust Company, receiver for Dickenson County Bank, Incorporated, brought this action against Mrs. F. H. Sutherland and Mrs. R. S. McFall to recover judgment against them as indorsers on two negotiable notes of the Clintwood Drug Company, dated August 21, 1930, and August 22, 1930, for $1,000 and $3,000 respectively. There was a trial by a jury, which resulted in a verdict in favor of the plaintiff below, upon which the court entered judgment.

The only defense made to the action by the plaintiffs in error was that they did not indorse the notes sued on, and it is asserted here that the verdict of the jury holding them liable is against the evidence and without evidence to support it.

Sometime prior to May 27, 1922, F. H. Sutherland and Dr. J. C. Sutherland were partners, doing business at Clintwood, Virginia, as Clintwood Drug Company. At that time F. H. Sutherland owed the Dickenson County Bank, Incorporated, $1,000, which he had borrowed to put into the business. Prior to December 21, 1923, Dr. J. C. Sutherland sold his interest to W. M. McFall, brother of the petitioner, Mrs. F. H. Sutherland, and on that date the Clintwood Drug Company executed its note for $3,000, same being the amount borrowed by W. M. McFall to purchase Dr. Sutherland's interest in the drug business. This note was indorsed by Mrs. F. H. Sutherland and W. M. McFall, and by Mrs. R. S. McFall, the mother of Mrs. F. H. Sutherland and W. M. McFall. The $1,000 debt of F. H. Sutherland was also evidenced by the note of Clintwood Drug Company, indorsed by the same persons. These notes were never paid but were from time to time renewed. In order to get the notes renewed W. M. McFall, who looked after the business, had to carry them each time to his mother and sister, Mrs. McFall and Mrs. Sutherland, for their indorsement. After this had gone on for a short time, to save trouble and

inconvenience, petitioners authorized W. M. McFall to indorse their names on the renewal notes for them, which he did with their full knowledge and without any question on their part until sometime in the year 1926. In the meantime F. H. Sutherland died, and on May 20, 1926, W. M. McFall purchased from Mrs. Sutherland, as her husband's personal representative, F. H. Sutherland's half interest in the drug store, under a written contract by which he assumed payment of the two notes referred to and all the indebtedness of the business. All the above is admitted by both sides, but here comes the conflict: Mrs. Sutherland testifies that shortly after the sale to McFall she informed the bank through its cashier, W. W. Presley, that she was no longer interested in the drug store and instructed him not to accept the notes any more with her name on them. She also told her brother, according to her testimony, that he was no longer authorized to indorse the notes for her, and not to put her name on them any more. Mrs. Sutherland is corroborated in this by Mrs. McFall and by her sister, both of whom testified that she told the cashier of the bank that she was not interested in the business, and that she would not be further responsible for any renewals of said notes.

On the other hand the cashier testifies as follows:

"Q. Tell the conversations you had with either Mrs. R. S. McFall or Mrs. F. H. Sutherland about the renewals and anything they said about Bill McFall signing their names to these notes.

"A. Mrs. Sutherland and probably Mrs. McFall both probably talked to me about the notes, and they told me not to accept the signature on them that they were not going to stand for them any longer, and I took the matter up with the board of directors and they would say institute suit immediately. I talked more with Fallie (Mrs. Sutherland) than any of them. I told them what the directors would say and sometimes it would take quite a while to get it worked out, but it would always end up by her telling me to go ahead and renew the notes and let Bill (W. M.) McFall

sign their names and that he had authority to sign them, and I told them we could not release them as endorsers that if we did that would release the other endorsers, and they told me one time that I remember distinctly that Bill had authority, and to let him sign them. Fallie told me the same thing at other times but I do not remember all the occasions so clearly, but they always told us that before we would renew the notes.

"Q. Did she tell you that after she told you not to accept her signature?

"A. Yes, sir, the most of my talk was with Fallie. She would come and tell me not to take the notes with her name on them, that Bill had no authority to sign their names and then we would get ready to bring suit on the notes and she would say just go ahead and let the notes be renewed, that Bill had authority to sign her and her mother's name to them and after she would tell me that we would accept the renewals but never did accept any renewal after she made the first objection until after we had consulted her and found it was all right."

It is testified by W. M. McFall that the signatures of Mrs. R. S. McFall and Mrs. F. H. Sutherland appearing as indorsers on the notes in suit were in his handwriting, but that he signed all the renewals of the notes, as well as those sued on, with the authority and consent of his mother and sister, and did not sign the name of either of them after they objected.

It appears that shortly before the notes sued on were executed, Mr. Presley was succeeded as cashier of the bank by Mr. Bellamy, who requested W. M. McFall to obtain written authority from his mother and sister to sign their names on the notes. It developed during the course of the trial that Mrs. McFall gave such authority and does not here question her liability for the principal of the notes, but Mrs. Sutherland refused to sign the authorization with her mother. It thus seems that the evidence on the issue submitted to the jury, so far as Mrs. Sutherland is concerned, is in direct conflict, and is sufficient to sustain a verdict

either for or against the petitioner. The jury being the sole judges of the weight of the testimony and the credibility of the witnesses, and their verdict having been approved by the trial judge, this court will not disturb it.

■ It is next contended by Mrs. Sutherland that the court erred in admitting evidence to the effect that she had given a deed of trust on all of her property, a short time prior to the trial of the case, to secure a debt. The record shows that on the cross-examination of Mrs. Sutherland this occurred:

"Q. Did you execute another deed of trust on your property just before this term of court for the sum of $3,000?

"Mr. Sutherland:

"Objected to.

"The Court:

"What is the purpose of that question?

"Mr. Phipps:

"To show that she is attempting to get her property out of her hands.

     *       *       *       *       *       *       *

"The Court: 'I will overrule the objection, she may offer any evidence she wishes in explanation of this.'

"Mr. Sutherland: 'We except.'"

■■ It is claimed that this evidence was irrelevant and prejudicial, especially in view of the conflict in the evidence on the issue before the jury. The general rule seems to be that transfers of property by a defendant during the pendency of a suit in which he may be held liable, may be shown by the plaintiff as tending to establish consciousness of liability on the part of the defendant, and a purpose to evade satisfaction of such liability. The fact that the defendant in the instant case gave a deed of trust on her property to secure a debt, the *bona fides* of which is not questioned, was not, it seems to us, such a transfer of property as comes within the purpose of the rule, and the evidence for that reason was irrelevant. We do not think, however, that the evidence, even though inadmissible, can be said to have been so prejudicial to the defendant as to

constitute reversible error. This is practically admitted by counsel in his brief, but it is argued that the remarks of the plaintiff's attorney and the court on the subject were highly prejudicial under the circumstances, for which the judgment should be reversed. With this contention we would feel inclined to agree and give the defendant the benefit of the exception, if counsel had complied with Rule XXII by calling the attention of the court, at the time, to the grounds upon which the objection was based. As seen, the objection made by counsel was to the admissibility of the evidence in regard to the deed of trust, and not to the comments made by the plaintiff's attorney and the court. If it had been informed at the time that the defendant objected to these statements, the trial court would have had an opportunity to correct any erroneous and harmful impression which may have been made on the minds of the jury by what was said. Not having done this, we do not feel it would subserve the ends of justice to grant a new trial of the case simply on that ground, in view of the fact that the evidence which supports the verdict and which was accredited by the jury seems entirely credible and reasonable.

The final objection assigned is that the court erred in granting judgment against the petitioners for ten per centum attorneys' fees stipulated in the notes, on the ground that the contract providing for such attorneys' fees is usurious. While the authorities on the subject are not harmonious, the validity of a stipulation providing for reasonable attorney's fees has been settled in Virginia since the case of Colley v. Summers Parrott Hardware Co., 119 Va. 439, 89 S. E. 906, Ann. Cas. 1917D, 375, which has been approved in numerous more recent decisions of this court, such as Cox v. Hagan, 125 Va. 656, 100 S. E. 666; Triplett v. Second National Bank, 121 Va. 189, 92 S. E. 897; Conway v. American National Bank, 146 Va. 357, 131 S. E. 803; Atkinson v. Neblett, 144 Va. 220, 132 S. E. 326; University of Richmond v. Stone, 148 Va. 686, 139 S. E. 257.

We deem it unnecessary to do more than to refer to the above decisions controlling the point.

For the foregoing reasons we are of the opinion that the judgment of the lower court should be affirmed.

*Affirmed.*

EPES, J., dissenting.